We will go on to case number two, and that case is appeal number 22-2462, Rene Galvan, Jr. v. State of Indiana. Hello, Mr. Darst. May it please the court, and good morning. Anytime you want to begin, please do. Thank you. Rene Galvan, as a classified employee of the State of Indiana, was guaranteed the constitutional right of procedural due process before his termination. That includes the notice of a charge, evidence against him, and an opportunity to respond to a notice of a charge and evidence. There was no charge against him. There was just a statement that, at the same time, just after he complained to Ms. Crum, his regional manager, that his written reprimand should be corrected because the county regional manager, Crum, immediately said, I want to have a predisposition meeting about what happened a couple of weeks ago with Liz Nigg, who was another case manager. That did not include any charge of any kind, no charge of any wrongdoing, no charge of any act, no charge of any date, no charge of any procedure or policy. And then that same day, Ms. Crum held what she called a pre-deprivation meeting, but did not present any evidence before or in the meeting to Mr. Galvan, which is the second denial of due process. Mr. Darst, what I had understood your client, though to be given, to have had the opportunity to do, is in that particular meeting to respond to Ms. Nigg's complaint. Ms. Nigg was not a complete stranger to him. He knew who she was. He was also aware, currently if I'm mistaken, that she had complained. He was aware of the complaint, not just as a matter of fact, but also as to its content, and then was invited to a meeting. And at that meeting, it looks to me from at least the record evidence at summary judgment that with that knowledge, he would have been positioned to respond to the substance of her complaint. Thank you, Judge. I believe you're referring to an email that she sent to local office director Keeman. That email was not shown to, or given to, or described to Mr. Galvan. No, fair enough, but he had had a couple of interactions with Ms. Nigg that she complained about, right? The one where they ended up in an argument about something, and the other where she No, I thought from the fact pattern, it just seemed crystal clear to me, or I thought so, that he absolutely knew who she was. He was aware of his interactions with her, and he was called into a meeting to say, you know, how do you explain this? Well, I think your question shows part of the problem, in that you're mentioning a couple of, I think you said, interactions, so that indicates a couple of dates, a couple of subject matters maybe in those interactions, and the cases show that the allegation should include the date of a wrongful act, and here we have no date of any wrongful act. Now, let me address the facts about Ms. Nigg. Ms. Nigg was not in his permanent team. She was a temporary employee, excuse me, she was a new employee who was assigned to him temporarily from another supervisor, so he did not know that much about her, but he tried to provide mentors to her. He provided a mentor to her for each time she went into the field. You mentioned a couple of interactions. We don't know exactly what interaction anybody's talking about. An email starts talking about a breakfast on, I think it was the 19th, where co-workers, not Galvin, but co-workers were hitting each other, and she mentioned that. Now, there's no allegation that Galvin did anything wrong. There was another date or interaction on, say, on a Tuesday, where she had an assessment. That was successful. There was another interaction on the Thursday, and she in that interaction, he told her to complete the safety plan, and she actually completed it. Now, the district court was in error in saying that she did not complete it, because the documents show the safety plans, which I think are docket 115-1, show that she did complete the plan. She told Galvin that she did complete the plan. The district court is in error in saying that she did not complete the plan. But excuse me for a moment, Mr. Durst. What you are trying to say, I take it, is that when Crum informed Galvin that the hearing concerned what happened with Nig a couple of weeks prior, it was not clear to Galvin by that reference alone what the hearing exactly concerned? Is that your bottom line? Yes, Your Honor. And was there any indication or any evidence indicating that Crum told Galvin that his job was going to be on the line in this? It's not a hearing. It's a meeting, right? That is correct. And could I ask you that? Go ahead. She did not. Okay. One of the questions, sometimes courts can get carried away with pre-deprivation hearings as pure fact-finding efforts. Do you understand it to be limited to that or also to be an opportunity for an employee who is a target of an accusation of wrongdoing to also talk about what would be an appropriate sanction? Yes, Your Honor. And for management to think about what would be an appropriate sanction, he was not given the form, the disciplinary justification form that was filled out and not given to him. He was not given a proposed suspension, and then that proposed suspension was changed to a proposed termination. Did Heumann propose suspension on the form or was it silent? Silent. Okay. As a matter of fact, her form was in error in several respects. It improperly alleged a second counseling, which was not in existence. It did not mention any policy that he violated, and there were several blank areas in the form. It was not given to Galvin. There was no allegation that Galvin did anything wrong. I've mentioned an October 19 breakfast. I've mentioned a Tuesday assessment. I've mentioned a Thursday time when Galvin said, please complete the plan. Bring it to me tomorrow. She completed the plan. The court is in error in saying that she did not complete the plan, but she said to him on that Friday, she did not have the plan. She completed it. Everything was okay. He said, all right, give it to me later. The following Monday, she did not appear at the office because she was assigned at a hospital for an evaluation, and then the next day, Tuesday, Galvin was not in the office because he was at her. He contacted her, and she did not respond to him. She went to the local office director, Heman, and then complained about Galvin. That's the first we know of a complaint about Galvin. Heman did not contact Galvin, which is a normal procedure, and say, hey, one of your temporary supervisees complained about you. What's the story here? What's your side of the story? She did not do any of that. She immediately assigned Nick to another supervisor and did not tell Galvin the reason, and then wrote a justification, disciplinary justification plan, or justification form that was not given to Galvin. Galvin then explained to Heman without seeing any of these documents, or asked her what's happening, and then he explained to her that he had requested Nick to give him a plan, and she did not give it to him because she said it was completed, but she did not have it, and she was not in the office on Monday. So, he and then Heman didn't have anything else to say about that because he had explained everything. So, then a week later... Mr. Jones, forgive me, but at any point in time, did Crummer, anyone else at the pre-deprivation hearing, provide a summary to Mr. Galvin of what they had learned regarding the incident, or incidents, or what evidence caused them to call the hearing? No, there was no allegation of any wrongdoing. They asked him what happened here, and he explained it. They did not give any evidence to him that he did anything wrong, but Crummer was asking, what about this, and what about that, and he explained it, and his explanations were not disputed by any evidence, or by any statement by Crummer or anyone else. So, there was So, I think it's probably important to say that a notice of a charge is more than we want to talk to you about something that happened a couple of weeks ago, about events that happened a couple of weeks ago. I mean, there's no wrongdoing alleged, no date, no policy, no opportunity, no evidence, no opportunity to respond. Let me, before, I guess I'm running out of time, let me respond, let me talk about the result. The result was still no specific allegation of wrongdoing. The letter of dismissal said failure to supervise, appropriate supervision, no specifications of what was appropriate, no specification as to what the supervision was, no allegation that anything was done wrong. So, then that ties into the more involved evidence of discrimination and retaliation, because there was no specific non-discriminatory reason offered for the termination of Galvin. So, Mr. Darst, I had understood on your retaliation claim, obviously timing is something that comes into play in retaliation claims a lot, and it's often hotly contested, as you know. I understood your case here to be argued on, in essence, a combination of the timing, plaintiff was doing acceptable work in August of 2018, then the next disciplinary action against him is the written reprimand, based on the disagreement where the judge agreed with him, and then he gets fired, right, three months later. But also, in essence, it's a combination of timing and arguably specious or false grounds given for the discipline. That is correct. In addition to other evidence, of no specific non-discriminatory reason, no initial showing by the defendant, the falsity of the reasons given for the discipline and the termination, failure to investigate, the failure of Heman or Crum to deny that they were discriminating, the failure of them to correct the discipline after he brought it to their attention, both the counseling and the reprimand, that they were in error, and not only was the reprimand shortly after he complained, but then when he complained about the, or excuse me, yeah, he complained that the reprimand was in error as found by the county judge, he was immediately, same day, closed timing, terminated without any investigation, without any consideration of the fact that Heman had lied about him and that other employees were treated better, the other Hispanic employee was, he and he were the only ones disciplined, and the other employees were so bad that Heman was even also supervised, was terminated for failure to come to the office and for failure to give any direction, which is failure to supervise, and then Crum was not terminated or disciplined for any of her supervision of Meg or Heman. Thank you. Thank you. All right. Ms. Record. Good morning, Ms. Record. Good morning. May it please the court, this court should affirm the district court's order screening summary judgment because Mr. Galvin had all the process that was due during the pre-deprivation meeting, as well as the post-deprivation proceedings, and the evidence... Mr. Unite, you acknowledge that a pre-deprivation hearing, at a minimum, requires oral or written notice of the charges and an explanation of the employer's evidence. What notice of the charges was given here and what explanation of the employer's evidence? Your Honor, Galvin was told about Nick's complaints on Friday, November 2nd by Heman. Heman told Galvin that Nick complained that he had yelled at her, that he wasn't providing her adequate support, and Heman also showed him the inadequate safety plans. So that was Friday, November 2nd. And then the day of the pre-deprivation meeting, Crum came to his office and told him they were going to have a pre-deprivation meeting about the incidents with Nick that occurred a few weeks prior. And these incidents had occurred, I believe, like October 19th to October 30th, between that time frame. And he said, okay. And then she told him to get a witness for the pre-deprivation meeting. So by that time, Galvin knew of Nick's complaints. He had time to prepare a response to them. Also... Could you stop for a minute? Yes. That afternoon, that morning, he's told you need a witness, right? That's correct. And you're saying he has time for all this? He was able to get a witness. He just, I'm sorry, Your Honor, he needed a witness to attend the hearing, not a witness about what occurred with Nick. Yes. So what was the strongest evidence indicating that he was facing termination for this hearing? Well, Galvin testified in the deposition that he knew the seriousness of the hearing, that he knew... I'm sorry? Galvin testified at the deposition that he knew the seriousness of a pre-deprivation meeting, that he knew it was for termination or more serious, like a suspension. So he testified that in his deposition, that before the pre-deprivation meeting, he knew it was for something serious. Okay. But for what exactly? I'm sorry. I'm not sure I understand your question. Well, it's the question that all of us have been asking about and Mr. Darst was talking about. What was the, what notice did he get of a charge of misconduct, of a fireable offense for somebody who was performing satisfactorily as of August 2018? Well, Your Honor, he was informed of the incidents with Nick, like I said, the Friday before. And so he knew of all of her complaints. And then the morning of the... Had he seen the email? No, I don't believe that he had seen the email, but he had seen the safety plan that was inadequate. So Hemann told him that Galvin had complained about him yelling at Nick and that Nick had also complained that he wasn't providing her adequate support when she was in the field. And then she also showed him the safety plan that was inadequate. So by the time we get to November 8th, he already knows that there's an issue with Nick. Does any of that... I got to say, I'm just astonished by this record. You agree that in August 2018, his review was satisfactory? That's correct, Your Honor. And then we've got this September incident that leads to a written reprimand where he thought the child should not be removed and the judge later agreed with him, right? Is that relevant for this? Is that discipline that we should take into account? The one that he asked Crum to remove? Relevant for the due process issue? Is that what you're asking? Or for the fact that the state fired him? No, I think the reason the state fired him was because of the incident with Nick. Okay, so and you go straight then from satisfactory to firing without ever any specific accusation? No, Your Honor, I disagree with that. They told him the specific accusations on Friday. Hemann was his supervisor. She went over all the issues with Nick. She talked about the safety plan. So you can't just look at what happened on November 8th without considering that he already knew that these were issues. Okay, but the issues arose after the prior performance evaluation. That's correct, yes. Yeah, and an employer can terminate someone for one instance just because you have good evaluations. Sure, there's no doubt about that. But it's, this seems, I'm looking at, we see a lot of public employment discipline cases, right? And this seems remarkably vague. And frankly, pretty subjective to go from satisfactory to get your stuff and leave this afternoon. Well, Your Honor, I think that you need to consider that we're talking about the Indiana Department of Child Services, whose entire job is to ensure the safety of children. And so... And it's also to preserve the integrity of families, correct? Correct. But Galvin was supposed to be overseeing his FCMs, and Nick was a very new FCM. And he failed to give her adequate support when she was in the field. She had called him. She was trying to make sure that she could place a child with, I believe it was a grandparent. And he kind of just blew her off. He said he'd talk to her tomorrow, but she was there at the placement. She needed to ensure that she was able to place him there. The inadequate safety plan, Galvin never reviewed it. This was a child who had alleged that she witnessed her parents doing drugs. And so we're talking about ensuring the safety of children. And his actions, I mean, compromise that. Over many years of experience with Indiana State Government and a lot of tragic incidents involving children and their safety, but also overly aggressive, I mean, overly aggressive interventions in families. You would agree there can be mistakes that are both false positives and false negatives here? That's correct. And the stakes are enormous, right? And I guess I'm trying to understand here how this escalated as quickly as it did in a case where apparently no harm came to the child, right? Um, that's correct. Okay. And when was it that Nick was removed from his supervision, from plaintiff's supervision? Um, it was around the time I think that Heiman had talked to him on November 2nd. So it was around the same time. I think that he learned maybe when he came in the following Monday that she was no longer, um, he was no longer going to be providing supervision to her. Okay. Um. But I want to add to that, Your Honor, and this kind of goes, goes for the discrimination and retaliation as well, that there were complaints about Galvin throughout his tenure with DCS. So even though he had meets expectation evaluations, there were still complaints about his behavior. Do you want to justify the firing based on the 2013 and 2014 complaints you cite in your brief? No, Your Honor. That's not justifying the termination. That was before he was promoted, right? Right. I think the only thing that that shows is that this behavior didn't occur after Crum became his supervisor. That this behavior, um, his trouble with communication... You are relying then on the 2013 and 14. Not to justify the termination, no. Um. I thought, why are we talking about it? For the discrimination. I'm sorry, for the discrimination because he, he argues that Crum and Heeman were the only two that discriminated against him, based on his ethnicity and gender. And so that shows that, um, that this wasn't new behavior. You know, he wasn't having absolutely no issues, and then Crum and Heeman come into the picture, and all of a sudden there are multiple issues. Ms. Rickert, with regard to the procedural due process issue, how could a post-deprivation hearing be sufficient? To protect his interests when, um... Um, Your Honor, I think that... Wait. When the hearing, um, occurred two, uh, two years later, isn't the delay between the pre-deprivation hearing and the post-deprivation hearing, um, an important factor in determining whether due process is provided? Um, Your Honor, I, I think that, um, the state's argument is that you don't look at either in isolation, that, um, the pre-deprivation ensures that there's not a mistake initially made, and then the post-deprivation hearing is just another check on that, where he has a more, um, thorough hearing and can present evidence, more evidence and witnesses. Um, two years later? Two years, is that, is that usual? Two years? I, I'm unsure whether that, that is usual, but, um... This was a case, this was an argument developed by the district court on her own initiative, correct? Um, yes, the, the post-deprivation hearing. But, but I want to add to that, um, that Galvin didn't complain about the post-deprivation hearing at all, um, below. He doesn't mention the post-deprivation hearing in his complaint. No, of course not. Right, so I... If they were violated, you know, November 8th, 2018. Right, so, but I, I think that if he took issue with the post-deprivation hearing, he should have raised those issues in his complaint or on summary judgment. Because due process, you look at both the pre-deprivation and the post-deprivation. Did you make that argument in the district court? No, because he never raised the post-deprivation. You didn't, there was no issue about the post-deprivation hearing raised at all. The district judge did this on her own initiative, right? Without notice to the plaintiff that she was thinking about doing it. Right, Your Honor, but, but I'm saying we didn't raise the post-deprivation hearing in our motion for summary judgment because it wasn't an issue. So, it was assumed that he had adequate procedures through the post-deprivation hearing. Do you have a response to our notation in Schultz against Baumgart that a post-deprivation hearing will not fix a pre-deprivation violation? Um, I don't, the, I know there are, um, there are newer cases, um, that do talk about how a, um, post-deprivation hearing will fix a... Well, what, well... Can I add to that, Your Honor? Sure. So, the post-deprivation hearing only, um, fixes the deficiencies if the state employee, um, didn't comply with the state's procedures for termination. Um, and, and in his, um, response to our motion for summary judgment, that's essentially what he's saying. He points out, um, that the state's procedures, which are pretty identical to the, um, pre-deprivation due process requirements talked about in Gilbert and Watermill, um, that the state didn't follow those because they didn't provide him notice or discuss the evidence. And so, when that is the case, when a, um, when a state employee terminates another employee without following the state's procedures, then the post-deprivation hearing can cure those deficiencies. And so, so that was, um, what the district court was saying in this case and also what we argued on appeal. But you didn't argue it in the district court? We didn't, but, but, Your Honor, I don't believe that... One, also, there's something else that didn't come up in the district court, and that is, um, did, did you all raise the, the parrot random and unauthorized theory in the district court, or was that something the court came up with on its own? Yes, that's what I was just speaking about. That's what the district court came up on its own. Right. And, um, we addressed this problem for public employee due process in considerable detail in a case called Bradley against the Village of University Park in saying that the, the parrot random and unauthorized theory, um, to excuse pre-deprivation due process does not apply in that situation because there's ample opportunity for an adequate pre-deprivation hearing. Mm-hmm. So the question here, as I understand it, is about whether the pre-deprivation hearing was adequate. That's correct, yes. Okay. And the state believes that it was, that it was, the pre-deprivation hearing was adequate, because he, again, he knew of, um, the reasons he was having the hearing was about the issues with Nigg. He already knew what those issues were. So, so was he, I'm, I'm, I'm, let me follow up on, on Judge Roedner's question. Was he asked, in essence, okay, Nigg accuses you of X, and it looks like you violated this policy. Mm-hmm. What do you have to say about that? Was it that specific? And is it undisputed that it was that specific? The evidence we have is that, um, during the pre-deprivation meeting, they explained the whole incident with Nigg, is what Galvin testified. And actually, Galvin testified that he had a full opportunity to present, present his side of the story. And I believe his deposition test, in his deposition he testifies there was nothing else he would have done. There's no witnesses. Even if he had the ability to call witnesses, there's no witnesses he would have called, or documentation he would have provided. So it's, it's really unclear what more was needed in this case. For the pre-deprivation hearing. There's no requirement that he be provided written notification of the charges prior. And I think that's kind of what he's wanting. He says the state didn't provide him with these written documents that, that it had, but that's not required. Going into it, he knew what the pre-deprivation hearing was about. He knew the seriousness. And he had a full opportunity to rebut that evidence. And he failed to do so. Um, if there are no other further questions, the state asks that this court affirm. Thank you. Thank you very much. Uh, Mr. Darst, you used up all your time, but, uh, we'll give you a couple of minutes. Thank you very much, Your Honor. There was no charge. You start the two minutes, please. Thank you. Thank you, Your Honor. There was no charge of wrongdoing on Mr. Galvin's part. Asking someone, what about an event is not in charge of wrongdoing? The, um, state has said that he was shown the safety plan of Nigg. He was not shown the safety plan by Nigg, so that he could interact with her to tell her about it. She didn't bring it in on Friday. She did not bring herself in on Monday. He was not there on Tuesday morning. And his supervision was taken away. When he was shown the safety plan by Heeman, he did not say that it was deficient or inadequate. He said that it could have been better because it was in bullet point form and not sentence form for the family. There was nothing inadequate or deficient about it, and the district court is in error in its order in saying that he agreed that it was deficient. Furthermore, the other comparators, the other supervisors who looked at the plan, including the other supervisors after him and Heeman and Crum who looked at the plan, did not make any changes to it. And it's in the record, and there was no change at all to it. So it wasn't deficient, it wasn't inadequate, and he did nothing wrong. I think the discrimination in this case is starkly shown by the defendant trying to drag up 2013 appraisal, which recommended as an improvement communication. But right above that paragraph is an exceeds expectations in another category that they didn't even mention, and it's just trying to cherry pick to criticize the Hispanic who was terminated and not recognize his compliments as a fantastic leader, as having the best team, as having the A team, having a team that ran without skipping a beat. Thank you. Thank you so much. Thanks to Mr. Darz. Thanks to Ms. Recker. Case will be taken under advisement. And the court is going to take a 10-minute recess.